Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 CR 192 - 1,2 | **DATE** | 3/9/2000 |
| **CASE TITLE** | United States of America vs. Juan Pedroza and Hilario Pedroza | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  All of the defendants' objections to the report and recommendation of Magistrate Bobrick are overruled. Defendants' motion to suppress evidence is denied. Defendants' motion to suppress statements is denied. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 10 2000 date docketed | |
| ✓ | Docketing to mail notices. | | | 67 |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | | |
| SLB | courtroom deputy's initials | 00 MAR -9 PM 3:14 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 99 CR 192 |
| v. | ) | |
| | ) | Judge George W. Lindberg |
| JUAN PEDROZA and HILARIO PEDROZA, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED MAR 10 2000

## MEMORANDUM OPINION AND ORDER

Defendants, Juan Pedroza ("Juan") and his brother, Hilario Pedroza ("Hilario"), have been charged with violations of Section 841(a)(1) of the Controlled Substances Act. 28 U.S.C. §841(a)(1). Both defendants filed motions to suppress physical evidence and statements, which were referred to Magistrate Judge Bobrick ("the magistrate judge"). The magistrate judge, following a hearing, submitted a Report and Recommendation ("report") to this court, recommending that all motions to suppress physical evidence and statements be denied. Juan and Hilario, in accordance with the terms of the relevant statute, have objected to the magistrate judge's recommended disposition of the motions to suppress. 28 U.S.C. §636(b)(1)(C). This court must make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. *Id.*

Defendants contend that law enforcement agents procured damaging evidence against them through unlawful and coercive means that are repugnant to the Fourth Amendment to the United States Constitution. U.S. Const. amend. IV. Specifically, Juan seeks to suppress two kilograms of cocaine that Drug Enforcement Administration agents found within a hidden

compartment of his black Ford Thunderbird, and $60,906.00 in cash, a handgun, and drug paraphernalia found in his home, arguing that this physical evidence was obtained through illegal searches of his vehicle and residence. In addition, Juan seeks to suppress $10,000.00 that the agents found inside a hidden compartment of his 1979 red Oldsmobile, which was parked in Hilario's garage at the time that the search commenced. Hilario seeks to suppress personal papers found in his home, as well as the $10,000.00 that agents found in the 1979 red Oldsmobile.

Both Juan and Hilario also seek to suppress all inculpatory statements given to law enforcement agents under claims that such statements were obtained contrary to the principles set forth in *Miranda v. Arizona* and because such statements were the product of coercive techniques employed by law enforcement officials. *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendants urge this court to suppress all such statements as obtained in violation of the Fifth Amendment to the Constitution of the United States. U.S. Const amend. V.

In response to these evidentiary challenges, the government asserts that proper police procedures were followed at all times during the investigation and subsequent arrest of defendants. Specifically, the government contends that the physical evidence was obtained only after defendants had consented, in writing, to searches of their homes and vehicles. In addition, the government claims that statements made by defendants were taken subsequent to the issuance of *Miranda* warnings and in non-coercive environments that afforded them ample opportunity to consider their decisions to make statements.

Juan and Hilario have raised one common objection as well as several individual objections to the magistrate judge's report. First, both Juan and Hilario take issue with the magistrate

99 CR 192

judge's statement that:

> These experienced and professional law enforcement officers understand the importance of obtaining consent for searches, in the absence of a search warrant, and. . . the importance of advising individuals under arrest of their *Miranda* rights. They have nothing to gain by omitting or riding rough shod over constitutional guarantees which include nonconsentual [sic.] warrantless searches and entries, and the right to remain silent and not to incriminate oneself.

Juan and Hilario contend that this statement is rebutted by the Fourth Amendment of the United States Constitution, in that the Fourth Amendment contemplates that a warrant be obtained only upon authorization by a judicial authority in order to avoid overzealous police officers from invading individual rights. Moreover, Hilario contends that the magistrate judge impermissibly created a presumption that law enforcement officers are genuinely concerned about defendants' individual rights.

This court finds that the magistrate judge neither intended to nor did create a presumption that law enforcement officers would act to protect individual rights. Instead, the magistrate judge's statement merely reflects his judgment that *"these"* [emphasis added] law enforcement officers knew the importance of the constitutionally protected rights of criminal defendants. The magistrate judge in no way indicated that all law enforcement officers should be credited with such knowledge; he only expressed his view that these particular agents were so knowledgeable.

In conducting a *de novo* review of the record, this court finds ample evidence to establish that the law enforcement agents involved in this case were indeed aware of the need to follow proper police procedure and not tread upon the individual liberties of defendants. The most concrete evidence of the understanding of and compliance with proper police procedure is the signed consent to search forms and waiver of rights forms. The validity of these forms is

3

99 CR 192

supported by the testimony of the agents, and, in certain cases, by defendants themselves.

Fairly read, the magistrate judge's statement merely reflects his judgment as to the credibility of these particular law enforcement officers' testimony. As such, the statement is not improper, and is well-supported by the facts. Therefore, Juan's and Hilario's objections to it are overruled.

Defendant Juan Pedroza individually raises four additional objections to the report. Two of these objections primarily relate to the magistrate judge's assessment of witness credibility, while the remaining two question the magistrate judge's legal findings. The court first turns to the question of witness credibility.

The magistrate judge determined that the testimony of the law enforcement agents was "fully reliable and credible," "non-evasive," and "consistent," and "each [agent's testimony] tending to support the other[s']." In marked contrast, the magistrate judge found defendants' testimony to be "inconsistent," "evasive," "unbelievable," "incredible," "unreliable," "baseless," "unsupported by any credible evidence," and "a total fabrication." Juan objects to the magistrate judge's assertion that the testimony of DEA agents Dominguez ("Dominguez"), Foley ("Foley"), Glynn ("Glynn"), and Nowacoski ("Nowacoski") is reliable. In support of his objection, Juan cites three examples which purportedly demonstrate inconsistency in the agents' testimony. First, Juan notes that Foley and Nowacoski testified that the search of Juan's Jeep occurred only after Juan's written consent was obtained. In contrast, Dominguez testified that the search of the Jeep began after Juan gave oral consent, and that the written consent form was filled out during the search.

4

While it is true that the agents' testimony is inconsistent on this point, the inconsistency is of little import for two reasons. First, no evidence was recovered from the Jeep. Thus, when and if the agents obtained Juan's consent to search the Jeep is inconsequential. Second, regardless of which agent's account is factually accurate, all of the agents agree that consent, either written or oral, was obtained before any searches began. Juan offers no credible evidence to the contrary; while Juan seems to suggest that he did not consent to the searches at all, his testimony is self-contradictory, and therefore unreliable, as to that point.

As a second example of inconsistency in the testimony of government witnesses, Juan compares the testimony of Dominguez and Nowacoski regarding the events that transpired when Foley pulled up next to Juan's Jeep at the corner of 31st and Pulaski. Dominguez testified that he was unable to see any of Foley's gestures or movements towards Juan due to the tinted windows on Foley's vehicle. Nowacoski, on the other hand, testified that he was able to see Foley lean towards Juan and speak to him. Juan asserts that the testimony of Dominguez and Nowacoski is inconsistent because both agents were behind Foley's vehicle when Foley pulled up next to Juan, yet one agent could see Foley's movements and the other could not.

A review of the record reveals that the testimony of Agents Dominguez and Nowacoski is not inconsistent on this point. Dominguez and Nowacoski were in two different vehicles. Dominguez's vehicle was situated behind Juan's Jeep at the stop light. Nowacoski's vehicle was directly behind Foley's vehicle, next to Dominguez's car. Thus, Nowacoski and Dominguez had different vantage points. It is not inconsistent that Nowacoski could see Foley's movements from his vantage point, but that Dominguez could not see those same movements from a different

99 CR 192

vantage point.

Finally, Juan finds inconsistency in the agents' testimony relating to the events at Hilario's residence. Dominguez testified that he was the first agent to enter Hilario's residence, and immediately placed Hilario under arrest at that time. Dominguez further testified that he would not have allowed Hilario to walk around freely in a house that may have contained weapons. However, Foley testified that Hilario was walking around freely when he arrived at Hilario's residence.

Juan is again in error when he asserts that the testimony of Dominguez and Foley is inconsistent on this point. The record reveals that Agent Dominguez approached Hilario's residence first. Dominguez testified that he knocked on Hilario's storm door. In response, Hilario approached Dominguez and said "Come on in." At that point, Dominguez, Glynn, and Nowacoski entered Hilario's residence through the front door. Dominguez immediately placed Hilario under arrest, and Nowacoski conducted a pat down search of Hilario's waste band. Dominguez asked Hilario if he could conduct a search of the house to look for other persons or weapons. Hilario indicated that he would allow the agents to do so. Dominguez then read Hilario his *Miranda* rights in Spanish. While reading Hilario his rights, other agents reported that the house was clear.

It is important to note that Foley was not present in the house before the weapons search had been completed. While Dominguez, Glynn, and Nowacoski entered Hilario's house through the front door, Foley went to the alley in the rear of the house. He remained there for approximately 10 minutes. He then was told by the agents inside the house that Hilario had

6

99 CR 192

consented to a search of the detached garage. Foley spent the next 20 minutes searching that garage. Thus, the protective sweep was completed by the time Foley entered Hilario's house.

Dominguez testified that he would not have allowed Hilario to walk around freely in a house that may have contained weapons. Foley only saw Hilario walking around freely after the persons/weapons search had been completed. Therefore, the testimony of Foley and Dominguez is not inconsistent.

Juan has only been able to cite one minor inconsistency in the testimony of the government witnesses. A review of the testimony indicates that, on the whole, the agents' testimony was indeed very consistent and reliable.

In contrast, a review of the transcripts indicates that Juan's testimony was fraught with inconsistencies and evasive maneuvers. The magistrate judge aptly identified numerous persuasive examples from Juan's testimony to demonstrate its unreliability, and this court need not reiterate those examples here. However, to underscore the conclusion, this court notes several other statements that raise questions about Juan's credibility. First, Juan's in-court statement that approximately seven police officers were present when he spoke with law enforcement officers at the corner of 31st and Pulaski conflicts with his prior affidavit that approximately 10 officers were present at that location. Second, Juan admitted that he lied to law enforcement agents when he was asked if he had any guns in his house. Finally, Juan wavered in his answers regarding exactly when he thought that he was under arrest.

Juan's second objection to the report is that the magistrate judge improperly characterized as evasive Juan's many "I don't know" responses to questions asked of him. Even if this court

7

did not consider such responses to be evasive, there is ample evidence of other inconsistent and evasive testimony, as discussed above, which are sufficient to render Juan's testimony unreliable.

Due to the many inconsistencies in Juan's testimony and his evasive responses, some of which have been noted in the report and in this opinion, this court finds Juan Pedroza's testimony to be unreliable. Juan's objection to the contrary is overruled. Moreover, because this court has determined that the testimony of the law enforcement agents was consistent and reliable, Juan's objection to the magistrate judge's characterization of it as reliable is overruled.

Juan individually raises two objections to the magistrate judge's legal findings. First, he objects to the magistrate judge's finding that he was not under arrest when he spoke to agents at the intersection of 31st and Pulaski. Based upon a review of the testimony, this court finds no merit in that objection.

According to the testimony of government witnesses, the initial meeting between Juan and law enforcement officers occurred in the daytime hours of March 18, 1999, at the corner of 31st and Pulaski. Foley pulled up next to Juan's Jeep and asked Juan if he would mind speaking with law enforcement officers. Juan agreed, and pulled over to talk with the agents. While interviewing Juan, Juan voluntarily offered to allow the agents to search his Jeep. Agents did so, but recovered no contraband. Subsequently, Juan consented to a search of his residence and a black Ford Thunderbird parked at his residence. He told law enforcement officers that his wife would be able to provide them with keys to that vehicle. Agents watching the house received notice of Juan's consent, and began the search while Juan was still talking to agents at the corner of 31st and Pulaski. The search of the Thunderbird resulted in the recovery of two kilograms of

99 CR 192

cocaine. Agents searching the house discovered $60,906.00 in cash, a handgun, and drug paraphernalia. Once agents at the corner of 31st and Pulaski received information that these items had been found, Dominguez read Juan his *Miranda* rights in Spanish from a wallet-sized DEA card.

Juan paints quite a different picture of his initial contact with police at the corner of 31st and Pulaski. He claims that he was told to pull over, not asked to speak with police. Juan testified that he felt he had no choice but to pull over. Once he pulled over, he asserts that his Jeep was blocked in by several law enforcement vehicles. He contends that he felt he was not free to leave. Juan asserts that he only gave agents permission to search his Jeep because the search was already underway when he was asked. Juan asserts that he was never asked for permission to search the Thunderbird and his residence, but was told to sign a consent to search form containing consent to search those locations. Juan testified that the consent to search form was never explained to him and that he was never informed of his rights during this time. Therefore, Juan argues that "[a]ny statements, including statements of consent to search prior to the reading of Miranda warnings should be suppressed and all consent found to be the product of an improper post custodial interrogation."

Encounters between law enforcement agents and citizens during which citizens are questioned are, without more, consensual. *United States v. Yusuff*, 96 F.3d 982 (7th Cir. 1996). To determine whether such an encounter elevated to "custody" for *Miranda* purposes, the court must examine all circumstances surrounding the questioning, but the central issue is whether there was a formal arrest or a restraint on the citizen's liberty of movement to the degree associated

9

99 CR 192

with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *United States v. James*, 113 F.3d 721, 727 (7th Cir. 1997). Thus, in order to show that an encounter elevated to "custody" for *Miranda* purposes, the defendant must have either been "formally arrested or subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained . . . [and, if the defendant was not formally arrested, a defendant is only deemed to be in custody for *Miranda* purposes when] a reasonable person in the defendant's position would believe that he or she was not free to leave." *Wyatt*, 179 F.3d at 536 (quoting *United States v. Lennick*, 917 F.2d 974 (7th Cir. 1990).

Juan presents no credible evidence to demonstrate that his initial meeting with police at the corner of 31st and Pulaski elevated from a consensual interview to "custody" for the purposes of *Miranda*. It is uncontested that Juan was not physically restrained at the corner of 31st and Pulaski. See *Wyatt*, 179 F.3d at 535-37. Indeed, law enforcement officers never impeded Juan's movement in any way. The credible testimony of law enforcement personnel indicates that Juan's Jeep was not blocked by agents' cars; the closest police vehicle to the front of Juan's Jeep was "a good 15 yards" away. Law enforcement agents never drew their weapons nor made any show of force. See *United States v. Scheets*, 188 F.3d 829, 842 (7th Cir. 1999). Juan was never placed in one of the agents' cars. See *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996). The officers were not wearing uniforms. See *United States v. Torres-Guevara*, 147 F.3d 1261 (10th Cir. 1998). In short, there is no evidence whatsoever that Juan's encounter with law enforcement agents at the corner of 31st and Pulaski elevated to "custody" for the purposes of *Miranda*. A reasonable person in Juan's position would have believed that he was free to leave. Therefore,

99 CR 192

Juan's objection to the magistrate judge's assessment of the encounter as a non-custodial interview is overruled.

Even if, as Juan contends, he was ordered to pull over by DEA agents, that fact scenario would not amount to a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Traffic stops, like *Terry* stops, do implicate the Fourth Amendment but do not necessarily require *Miranda* warnings in the absence of some objective restraint on a person's liberty of movement. *Id.* at 439-40. Neither would the mere fact that a pat-down search was conducted so elevate the encounter. *Wyatt*, 179 F.3d at 536-37.

Juan's final objection to the report is that the magistrate judge improperly found Juan to have voluntarily consented to the searches of his Jeep, Thunderbird, and residence. The gravamen of this objection is that, regardless of whether or not Juan was "in custody," any consent to search that he gave was not voluntary.

In order to be valid, the consent to search must be voluntary. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Voluntariness is a question of fact to be determined from all the circumstances. *Id.* Juan argues that his consent was not voluntary because he thought he had no right to refuse consent or refuse to sign the form.

The mere fact that Juan thought he had no right to refuse consent or refuse to sign the form, even if true, would not be dispositive on the issue of voluntariness. *Robinette*, 519 U.S. at 39. There is no evidence that Juan was coerced into signing the consent to search form. The fact that Dominguez, rather than Juan, wrote the locations to be searched on the consent form is likewise not dispositive, as credible evidence suggests that the agent explained to Juan exactly

11

99 CR 192

what he was doing.

The Seventh Circuit has considered the following factors in determining whether a consent to search was given voluntarily: (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed. *United States v. Yusuff*, 96 F.3d 982, 985-86 (7th Cir. 1996).

Looking to the totality of the circumstances in the instant case, this court cannot conclude that Juan's consent to search was given involuntarily. The encounter occurred on a public curbside in broad daylight. The credible testimony of law enforcement agents establishes that Juan consented to speak with them. Law enforcement agents never drew their weapons nor made any show of force. The movement of Juan's vehicle was not impeded by the agents' vehicles; the closest vehicle parked in front of Juan's Jeep was "a good 15 yards" away. There is not a single strand of credible evidence to indicate that Juan's consent was wrested away from him by coercive means. Therefore, Juan's objection to the magistrate judge's finding that the consent was voluntary is overruled.

Defendant Hilario Pedroza individually raises three objections to the report. First, Hilario objects to the magistrate judge's finding that agents had probable cause to arrest him at his home on March 18, 1999. Second, Hilario objects to the magistrate judge's finding that Hilario

99 CR 192

voluntarily consented to a search of his residence and the Oldsmobile parked in the garage at that location. The court turns first to the issue of probable cause.

The testimony of government witnesses indicates that Juan was seen driving a black Ford Thunderbird to his brother Hilario's residence on the morning of March 18, 1999. Hilario was seen passing a cardboard box to Juan through the window of that Thunderbird. Juan then left Hilario's residence and returned to his own. Juan exited the black Thunderbird, apparently leaving the box inside, and entered his house. A short time later, Juan was observed leaving his house in a red Jeep. Some agents followed Juan in the Jeep, while others remained near his residence to continue surveillance of the black Thunderbird.

After Juan consented to speak with police, and consented to a search of his Jeep, his Thunderbird, and his residence, agents who searched the black Thunderbird found a cardboard box containing two kilograms of cocaine in a hidden compartment of that vehicle. The cardboard box appeared to be the same one that Hilario was seen to transfer to Juan earlier that day. When Dominguez asked Juan about the drugs, Juan acknowledged that he had obtained the drugs from Hilario.

Any arrest must be based on probable cause. See, e.g., *Dunaway v. New York*, 442 U.S. 200 (1979). Probable cause to arrest is a standard that has been stated in various ways, but in substance means that there must be a reasonable ground for the belief that a crime has been committed and that the defendant is probably culpable. See, e.g., *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Law enforcement officers had probable cause to arrest Hilario at his home. Agents had

13

99 CR 192

seen Hilario transfer a box to Juan that same day, and that box was later found to contain two kilograms of cocaine when it was recovered from the hidden compartment in Juan's Thunderbird. Moreover, the credible testimony of law enforcement agents indicated that Juan acknowledged that he had received the cocaine from Hilario. These two pieces of information were enough to justify a reasonable belief on the part of law enforcement officers that a crime had been committed and that Hilario was probably culpable. Therefore, this court finds that probable cause to arrest Hilario did exist, and Hilario's objection to the contrary is overruled.

Hilario's second objection to the report is that the magistrate judge improperly determined that he consented to the agents' entry into his home. Hilario contends that he never gave agents permission to enter his house, and insists that law enforcement personnel never knocked on his front door to request entry. Instead, he asserts that the officers burst into his home without a warrant and without his consent, and therefore urges this court to suppress all evidence recovered and all statements that he gave to police.

The testimony of the law enforcement agents paints quite a different picture of the events that transpired at Hilario's house. Agents testified that Dominguez knocked on Hilario's front door, and only after Hilario saw the agents and responded, "Come on in," did agents enter his house.

As the testimony of the law enforcement agents differs from that offered by Hilario, the issue of whether or not Hilario consented to the presence of agents in his home is a question of witness credibility. This court has already found the officers' testimony to be credible. In contrast, Hilario's testimony, like Juan's, is filled with inconsistencies and attempts to be evasive.

14

99 CR 192

For example, Hilario gave unclear and evasive answers when the magistrate judge inquired about whether Dominguez had informed him of his *Miranda* rights. Moreover, Hilario changed his version of the events relating to the agents' entry. At one point, Hilario insisted that the agents were already in the house when he first saw them, but later testified that the agents were just entering his front door when he first saw them.

Thus, this court finds that the magistrate judge properly characterized Hilario's testimony as unreliable. A review of the record indicates that the credible testimony of law enforcement officers established that Hilario did indeed consent to the search of his home and the red 1979 Oldsmobile located there. Hilario's objection to the contrary is overruled.

Hilario's third and last objection to the report is that the magistrate judge improperly determined that Hilario voluntarily consented to the searches of his residence and of Juan's Oldsmobile parked at Hilario's residence. Hilario argues that he only consented to the searches in acquiescence to the immense display of law enforcement authority and power.

As stated earlier, voluntariness is a question of fact to be determined from all the circumstances. *Robinette*, 519 U.S. at 40. Looking to the circumstances surrounding the agents' entry into Hilario's home, this court finds no evidence of coercive or "strong arm" tactics. While agents were armed when they entered Hilario's home, agents never brandished their weapons. Credible evidence suggests that agents entered Hilario's home with his consent as well as asked for and received his consent to search the house and the Oldsmobile parked there.

Moreover, courts have upheld consents as voluntary in much more threatening situations. See *United States v. Kozinski*, 16 F.3d 795 (7th Cir. 1994); *United States v. LaGrone*, 43 F.3d

99 CR 192

332, 334 (7th Cir. 1994); *United States v. Taylor*, 31 F.3d 459, 463 (7th Cir. 1994); *United States v. Rojas*, 783 F.2d 105 (7th Cir. 1986). The report describes the facts of several such cases, and this court need not address those facts in this opinion.

Accordingly, this court finds that Hilario voluntarily consented to the searches of his residence and Juan's red Oldsmobile parked there. Hilario's objection to the magistrate judge's finding of voluntary consent is therefore overruled.

ORDERED: All of Juan Pedroza's and Hilario Pedroza's objections to the Report and Recommendation of Magistrate Judge Bobrick are overruled.

Defendant Juan Pedroza's motion to suppress evidence is denied. Defendant Juan Pedroza's motion to suppress statements is denied.

Defendant Hilario Pedroza's motion to suppress evidence is denied. Defendant Hilario Pedroza's motion to suppress statements is denied.

ENTER:

GEORGE W. LINDBERG
District Judge

DATED: MAR 9 2000